AUSA: Joseph H. Rosenberg

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

YONGCHUL "CHARLIE" KIM,

Defendant.

**24 MAG 2106**

RULE 5(c)(3) AFFIDAVIT

SOUTHERN DISTRICT OF NEW YORK, ss.:

Sebastian Gardner, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

On or about May 30, 2024, the United States District Court for the District of Columbia issued a warrant for the arrest of "Yongchul 'Charlie' Kim" based on an indictment charging: (1) conspiracy, in violation of 18 U.S.C. § 371; and (2) bribery, in violation of 18 U.S.C. § 201(b)(1). Copies of the indictment and arrest warrant are attached hereto and incorporated by reference herein.

On or about May 31, 2024, I participated in the arrest of YONGCHUL "CHARLIE" KIM, the defendant, in the Southern District of New York. I believe that YONGCHUL "CHARLIE" KIM is the same person as the "Yongchul 'Charlie' Kim" who is wanted by the United States District Court for the District of Columbia.

The bases for my knowledge and for the foregoing charges are, in part, as follows:

1. I am a Special Agent with the FBI. I have been personally involved in determining whether YONGCHUL "CHARLIE" KIM, the defendant, is the same individual as the "Yongchul 'Charlie' Kim" named in the May 30, 2024 arrest warrant from the United States District Court for the District of Columbia. Because this Affidavit is being submitted for the limited purpose of establishing the identity of the defendant, I have not included in this Affidavit each and every fact that I have learned. Where I report statements made by others, those statements are described in substance and in part, unless otherwise noted.

2. Based on my review of documents from the United States District Court for the District of Columbia, I know that, on or about May 30, 2024, the United States District Court for the District of Columbia issued a warrant for the arrest of "Yongchul 'Charlie' Kim" (the "Arrest Warrant"). The Arrest Warrant was based on an indictment (the "Indictment") charging "Yongchul 'Charlie' Kim" with violations of 18 U.S.C. §§ 371 and 201(b)(1).

3. On or about May 31, 2024, at approximately 6:00 a.m., law enforcement agents arrested YONGCHUL "CHARLIE" KIM, the defendant, at a residential building in Manhattan, New York (the "Residential Address").

4. Based on my participation in this arrest, my conversations with other law enforcement officers, and my review of law enforcement records, I believe that YONGCHUL "CHARLIE" KIM, the defendant, is the "Yongchul 'Charlie' Kim" named in the Arrest Warrant based on the following:

a. At the time YONGCHUL "CHARLIE" KIM, the defendant, was taken into federal custody, KIM identified himself as "Yongchul 'Charlie' Kim" and orally provided a date of birth and Social Security Number that are the same as the date of birth and Social Security Number that appear in law enforcement records for the "Yongchul 'Charlie' Kim" named in the Arrest Warrant.

b. As described in the Indictment (¶ 2), which is attached, "Yongchul 'Charlie' Kim" is the co-CEO of Company A. On Company A's website, there is a photograph of an individual named "Charlie Kim" who is listed as the "Founder & Co-CEO" of Company A. Based on my review of that photograph, I believe that the man depicted in that photograph is YONGCHUL "CHARLIE" KIM, the defendant, that is, the same man that law enforcement agents arrested at the Residential Address in Manhattan, New York, on May 31, 2024.

5. Accordingly, I believe that the "Yongchul 'Charlie' Kim" sought in the Arrest Warrant is YONGCHUL "CHARLIE" KIM, the defendant.

WHEREFORE, I respectfully request that YONGCHUL "CHARLIE" KIM, the defendant, be imprisoned or bailed, as the case may be.

Sebastian Gardner
Special Agent
Federal Bureau of Investigation

Sworn to before me this
31st day of May 2024.

THE HONORABLE JENNIFER E. WILLIS
United States Magistrate Judge
Southern District of New York

AO 442 (Rev. 01/09) Arrest Warrant

# UNITED STATES DISTRICT COURT
for the
District of Columbia

United States of America
v.

Yongchul "Charlie" Kim,

*Defendant*

)
)
)
)
)
)

Case: 1:24-cr-00265
Assigned To : Judge Trevor N. McFadden
Assign. Date : 5/30/2024
Description: Indictment (B)

## ARREST WARRANT

To: Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)* Yongchul "Charlie" Kim

who is accused of an offense or violation based on the following document filed with the court:

☒ Indictment  ☐ Superseding Indictment  ☐ Information  ☐ Superseding Information  ☐ Complaint
☐ Probation Violation Petition  ☐ Supervised Release Violation Petition  ☐ Violation Notice  ☐ Order of the Court

This offense is briefly described as follows:
Count 1: 18 U.S.C. § 371 (Conspiracy); Count 2: 18 U.S.C. § 201(b)(1) (Bribery)

Date: 05/30/2024

*Issuing officer's signature*

City and state: Washington, D.C.

G. Michael Harvey, U.S. Magistrate Judge
*Printed name and title*

### Return

This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____
at *(city and state)* _____

Date: _____

*Arresting officer's signature*

*Printed name and title*

RECEIVED
MAY 30 2024
Clerk, U.S. District and
Bankruptcy Courts

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on September 15, 2023.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| | : | Grand Jury Original |
| | : | |
| v. | : | VIOLATIONS: |
| | : | |
| | : | Count 1: 18 U.S.C. § 371 |
| ROBERT P. BURKE, | : | (Conspiracy) |
| (Counts 1, 3, 4, 5) | : | |
| | : | Count 2: 18 U.S.C. § 201(b)(1) |
| YONGCHUL "CHARLIE" KIM, and | : | (Bribery) |
| (Counts 1, 2) | : | |
| | : | Count 3: 18 U.S.C. § 201(b)(2) |
| MEGHAN MESSENGER, | : | (Bribery) |
| (Counts 1, 2) | : | |
| | : | Count 4: 18 U.S.C. § 208(a) |
| Defendants. | : | (Acts Affecting a Personal |
| | : | Financial Interest) |
| | : | |
| | : | Count 5: 18 U.S.C. § 1001(a)(1) |
| | : | (Concealment of Material Facts) |
| | : | |
| | : | 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. |
| | : | § 2461(c), and 21 U.S.C. § 853(p) |
| | : | (Criminal Forfeiture) |

**INDICTMENT**

The Grand Jury charges that:

At all times material to this Indictment, on or about the dates and times stated herein:

## GENERAL ALLEGATIONS

1. Defendant ROBERT P. BURKE, a resident of the State of Florida, was a four-star Admiral in the United States Navy ("Navy"). From July 2020 until his retirement on August 1, 2022, BURKE held the position of Commander, U.S. Naval Forces Europe and Africa, which was one of nine operational commands in the Navy. Headquartered in Naples, Italy, BURKE oversaw all Navy operations in Europe, Russia, most of Africa, and their surrounding waters, and he commanded thousands of military and civilian personnel. As a Navy Admiral, BURKE was a public official; that is, BURKE acted for and on behalf of the United States in an official function under the authority of the Navy.

2. Defendant YONGCHUL "CHARLIE" KIM, a resident of the State of New York, was the founder and co-chief executive officer of Company A, which sold: (1) access to a "perks at work" program that offered retail discounts for clients' employees; and (2) workforce training programs.

3. Defendant MEGHAN MESSENGER, a resident of the State of New York, was the co-chief executive officer of Company A.

4. As a public official, pursuant to Navy regulations and standards of conduct, BURKE had a lawful duty to perform his responsibilities consistent with the established policies, practices, directives and orders of the Navy and the Department of Defense, including by:

   a. Not accepting any gift or other item of monetary value from any person or entity seeking official action from the Navy, or from any person or entity whose interests may be substantially affected by the performance or nonperformance of his duties;

   b. Not engaging in outside employment, including seeking or negotiating for employment, that conflicted with official Government duties and responsibilities;

2

c. Not participating personally and substantially in an official capacity in any particular matter that had a direct and predictable effect on his financial interests;

   d. If "negotiating" or "seeking employment," disqualifying himself from taking official action which affected financial interests of a potential employer; and

   e. If personally and substantially involved in procurement greater than $150,000, promptly reporting all contacts from bidders regarding potential employment, even if promptly rejected.

## OTHER RELEVANT ENTITIES AND INDIVIDUALS

5. The United States Office of Personnel Management ("OPM") had a program that enabled federal agencies to obtain workforce training from non-governmental suppliers.

6. Company B was the prime contractor for the OPM program. As such, Company B could and did hire subcontractors to fulfill task orders from OPM.

7. Person 1 was an Admiral and chief human resources officer for the Navy.

8. Person 2 was a civilian employee in the Navy assigned to U.S. Naval Forces Europe and Africa and, therefore, under BURKE's command.

9. Person 3 was a civilian employee in the Navy based in the United States and a companion of BURKE's.

10. Person 4 was an Admiral at U.S. Fleet Forces Command, which was responsible for training servicemembers prior to their deployments across the globe.

## BACKGROUND

11. From August 2018 through July 2019, Company A had subcontracts from Company B, via OPM, to provide a workforce training pilot program to a small part of the Navy.

3

BURKE, before he became the Commander of U.S. Naval Forces Europe and Africa, advocated for the pilot program.

12. The Navy terminated the pilot program by November 2019, and Company A was paid less than the full value stated on the subcontracts. KIM believed that the pilot program could have turned into a $100 million Navy contract for Company A, but, as he later stated, "many things derailed our Navy engagement."

13. By November 2019, Company A had no active contracts (or subcontracts) with the United States Government (or Company B) in connection with workforce training for the Navy.

14. On November 8, 2019, KIM and MESSENGER emailed BURKE – then the Vice Chief of Naval Operations (the second highest ranked officer in the Navy) – to reestablish business with the Navy. An aide to BURKE replied that "[g]iven Admiral Burke's role and the upcoming contracting actions," Company A was not to contact BURKE until further notice.

15. On November 8, 2019, KIM, copying MESSENGER, forwarded the aide's email to BURKE, stating, "will stand by until we hear from you."

16. On June 23, 2020, KIM contacted Person 1, copying MESSENGER and others, acknowledging, "We've been told to not contact/communicate with Admiral Burke given we are in the 'contracting actions phase,'" and requesting "any indication/insights into our status with the Navy." Person 1 replied, "Understand your frustration. Unfortunately, I am not able to answer your question and will have to refer you to the Contracting Office for a status update."

17. By September 2020, Company A still had not reestablished business with the Navy.

18. According to its financial statements, Company A reported zero revenue from its workforce training business from the second quarter of 2019 through the fourth quarter of 2021.

4

## COUNT ONE
(Conspiracy – 18 U.S.C. § 371)

### THE CONSPIRACY AND ITS OBJECTS

19. Paragraphs 1 through 18 are re-alleged and incorporated herein.

20. Beginning at least as early as September 2020 through October 2022, in the District of Columbia and elsewhere, the defendants,

**ROBERT P. BURKE,
YONGCHUL "CHARLIE" KIM, and
MEGHAN MESSENGER**

did knowingly combine, conspire, confederate, and agree with each other and others known and unknown to the Grand Jury to commit an offense against the United States, that is:

   a. For KIM and MESSENGER to directly and indirectly, corruptly give, offer and promise anything of value to BURKE, a public official, to influence an official act, in violation of Title 18, United States Code, Section 201(b)(1); and

   b. For BURKE, a public official, to directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept anything of value personally and for any other person and entity, in return for being influenced in the performance of an official act, in violation of Title 18, United States Code, Section 201(b)(2).

### Purpose of the Conspiracy

21. The purpose of the conspiracy was for the defendants to use BURKE's official position as a Navy Admiral to benefit and enrich themselves through bribery.

### Manner and Means

The conspiracy was carried out through the following manner and means, among others:

22. KIM and MESSENGER initiated prohibited contact with BURKE to discuss how Company A could get a contract with the Navy.

5

23. KIM and MESSENGER offered and gave, and BURKE solicited and accepted, things of value, including employment at Company A, with a yearly base salary of $500,000 and a grant of 100,000 stock options.

24. In return for employment and related compensation, BURKE agreed to and did use his official position, authority, relationships, and influence at the Navy to help Company A obtain a contract from U.S. Naval Forces Europe and Africa.

25. BURKE further agreed that after Company A performed the training, he would remain in the Navy for approximately six months and influence other senior Navy officers to award another contract for Company A – this time to train a larger portion of the Navy – that KIM estimated to be worth "triple digit millions" of dollars.

26. The existence and nature of the conspiracy was concealed from the Navy. For example, BURKE:

   a. Delayed disclosing to the Navy his employment and contracting discussions with KIM and MESSENGER – because he knew that doing so would have disqualified him from ordering his subordinates to give a contract to Company A;

   b. Signed an official memorandum to the Navy's Chief of Naval Operations that contained material misrepresentations and omissions regarding his employment and contracting discussions with KIM and MESSENGER; and

   c. Provided other false information to a Navy ethics counselor in seeking Post-Government Employment Opinions.

## Overt Acts

In furtherance of the conspiracy, and to effect its objects and purposes, BURKE, KIM, MESSENGER, and others committed the following overt acts, among others, in the District of Columbia, and elsewhere:

**KIM and MESSENGER Initiated Prohibited Contact with BURKE to Seek a Contract**

27. On September 23, 2020, KIM, copying MESSENGER, emailed BURKE, despite having been instructed by the Navy not to. KIM asked for "insights or guidance" about a Navy contract for Company A. BURKE responded that he would get back to KIM and MESSENGER, but never did.

28. On February 19, 2021, KIM emailed BURKE, asking to connect for "at least an hour or so to catch up," and promoting Company A's training program.

29. On February 24, 2021, KIM emailed BURKE, stating "I know you must be very busy," but requesting "an hour of your time[.]" KIM again promoted Company A. BURKE responded that an aide would schedule a meeting "in the next week or two."

30. On March 5, 2021, KIM, copying MESSENGER, emailed BURKE, noting that Company A planned to open a new headquarters in New York City that summer, and inviting BURKE and his spouse to visit.

31. On April 20, 2021, KIM and MESSENGER spoke with BURKE via WhatsApp. Describing the call afterward, KIM stated that BURKE "wants to work for us but we're asking for a deal first" and that while MESSENGER "felt slimy," KIM "was nervous but calm."

32. On May 6, 2021, BURKE directed Person 2 to find money for a future contract for Company A from U.S. Naval Forces Europe and Africa. BURKE also told KIM and MESSENGER that Person 2 was "working options and angles hard for funding our project[.]"

7

33. On May 10, 2021, KIM, copying MESSENGER, emailed BURKE to propose a $20 million contract for Company A to provide workforce training for BURKE's command – even though U.S. Naval Forces Europe and Africa had not identified a need for such training or requested that companies submit bids for such a contract.

34. On July 13, 2021, KIM, MESSENGER, and BURKE agreed to meet ten days later in Washington, D.C.

### In Exchange for a Navy Contract, KIM and MESSENGER Offered BURKE a Job and Part Ownership in Company A, which BURKE Accepted

35. On July 23, 2021, KIM, MESSENGER, BURKE (while on duty), and Person 3 had lunch in Washington, D.C., paid for by Company A, during which KIM and MESSENGER proposed that:

   a. BURKE use his official position to steer a workforce training contract from U.S. Naval Forces Europe and Africa to Company A;

   b. BURKE remain in the Navy for approximately six months after Company A performed the contract and, pointing to its performance, influence senior Navy officers to award another contract to Company A – to train a larger portion of the Navy – before BURKE retired; and

   c. In exchange, offered BURKE a job at Company A – at a salary of at least $500,000 per year plus stock options and other related compensation – to commence after BURKE retired from the Navy, which BURKE agreed to accept.

### BURKE Steered a Sole-Source U.S. Government Contract to Company A in Exchange for the post-Navy Employment

36. On November 16, 2021, BURKE (while off duty) met with KIM and MESSENGER at Company A's headquarters in New York City. Describing the meeting afterward, KIM stated, "we're about to go full force back into business with the Navy," and

8

BURKE would aim to have a contract in place and signed before Christmas. KIM stated the contract would include in-person training to BURKE's command in Naples, Italy, and Rota, Spain in early 2022.

37. On December 16, 2021, KIM, copying MESSENGER, emailed BURKE, attaching a "Pricing worksheet" that listed a total price of $413,500 for Company A's training: $213,500 for the training, plus a $200,000 surcharge to give it in person in Italy and Spain.

38. On December 17, 2021, BURKE ordered Person 2 to provide a contract to Company A, to make sure the contract was in place by January 10, 2022, and for it to be valued at approximately $350,000.

39. On December 20, 2021, BURKE emailed KIM and MESSENGER, stating that his staff could not implement a contract by January 10, 2022. The same day, KIM replied asking, "for the sake of speed," that BURKE consider issuing the contract to Company A through Company B.

40. On December 21, 2021, KIM, copying MESSENGER, again told BURKE that Company A could get the contract through OPM and Company B. KIM added, "we prefer to get this done as soon as possible." The same day, BURKE replied, "We'll work with both and take the fastest route."

41. On December 27, 2021, U.S. Naval Forces Europe and Africa submitted a Military Interdepartmental Purchase Request ("MIPR") to OPM. The MIPR ordered a training program that would include applications only Company A provided; thus, the MIPR was actually a sole-source contract. The MIPR required the training program to occur on January 10, 2022, in Naples, Italy, and Rota, Spain. The value of the MIPR was $355,135.

42. On January 5, 2022, OPM sent Company B a task order based on the requirements stated in the MIPR. The order included a travel allowance of $13,200.

9

43. Company B later contracted with and paid Company A approximately $257,000 related to this task order.

44. From January 8 to January 15, 2022, Company A employees, including KIM and MESSENGER, traveled to Naples, Italy, and Rota, Spain, and provided the "On My Mind" training to personnel under BURKE's command pursuant to the MIPR.

### BURKE Continued to Use His Official Position to Promote Company A for Six Months as Planned

45. BURKE remained in the Navy and promoted Company A to senior Navy officers – while suggesting another contract for Company A to train a larger portion of the Navy – without disclosing his prior employment offer from KIM and MESSENGER. For example:

   a. On March 12, 2022, BURKE emailed a Foreign Military Officer asking him/her to report back about the Foreign Military's efforts to contract with Company A because such information would advance Company A's efforts to market Company A to a wider U.S. Navy audience.

   b. On March 14, 2022, BURKE sent an email introducing KIM and MESSENGER to Person 4, a four-star Navy Admiral who oversaw training programs for Navy recruits' "pipeline schools." BURKE promoted Company A's training program to Person 4.

   c. On March 28, 2022, BURKE forwarded an email to Person 4 that contained a proposal for Company A to provide training to the Foreign Military. BURKE commented that the Foreign Military's proposal had "sort of the same components I would see us using."

   d. On May 25, 2022, BURKE emailed a Senior Foreign Military Official, stating, "I wanted to write you a short note on [Company A] – something I know the [Foreign

10

Military] is exploring." BURKE promoted Company A's training, said that he had "put together a proposal for wider US Navy implementation," and added, "my team is standing by as your local US Navy team to help in any way as the [Foreign Military] considers a similar path."

## Concealment of the Conspiracy

46. The conspiracy was concealed from the Navy through misleading and false statements and material omissions. For example:

   a. On August 26, 2021 (about one month after the defendants met in Washington, D.C.), BURKE sent the Secretary of the Navy a memo requesting voluntary retirement in May 2022. BURKE also affirmed that he had "read and thoroughly examined DOD Directive 5500.07R concerning pre- and post-retirement standards of conduct and employment activities," falsely implying that BURKE had been and would continue to follow those standards.

   b. On March 28, 2022, BURKE emailed a Navy Ethics Counselor, and falsely stated, with respect to post-Government employment, that he "had no conversations, have no intent to aim for a specific company, and most likely will not actively seek employment until after 1 July."

   c. On May 6, 2022, BURKE emailed the Navy Ethics Counselor, falsely implying that Company A had just approached him to ask "if I would be interested in having post-Navy employment discussions," and falsely stating that he told Company A that "I could not, had some prerequisites to meet and would get back to them if/when I met those prerequisites." BURKE disclosed that U.S. Naval Forces Europe and Africa had given Company A the contract discussed above, but he also falsely claimed the contract decision was through Person 2.

11

d. On May 9, 2022, BURKE signed a memorandum to the Navy's Chief of Naval Operations with the subject line "DISQUALIFICATION STATEMENT (EMPLOYMENT)". The memorandum stated, "I anticipate commencing discussions related to employment with the company listed below . . . [Company A]," even though he already negotiated for and obtained a promise of employment at Company A from KIM and MESSENGER.

e. On July 18, 2022, BURKE submitted to the Office of Government Ethics in Washington, D.C., an "Executive Branch Personnel Public Financial Disclosure Report (OGE Form 278e)." In a section called "Filer's Employment Agreements and Arrangements," BURKE stated that he had "tentatively accepted a job offer from [Company A]" and "Disqualification memo signed 9 May 22. Letter of offer received 24 May and accepted 26 May 22." BURKE e-signed the document, "certify[ing that] the statements I have made in this form are true, complete and correct to the best of my knowledge" – even though the form did not include any information about his prior job discussions with KIM and MESSENGER.

47. In or about October 2022, BURKE began employment as a "Senior Partner" at Company A and by January 2023 had received gross compensation of about $125,000.

**(All in violation of Title 18, United States Code, Section 371)**

### COUNT TWO
**(Bribery – 18 U.S.C. § 201(b)(1))**

48. Paragraphs 1 through 18, 27 through 44, and 47 are realleged and incorporated herein.

49. Beginning at least as early as September 2020, and continuing through October 2022, in the District of Columbia and elsewhere, the defendants,

12

## YONGCHUL "CHARLIE" KIM and
## MEGHAN MESSENGER,

directly and indirectly, corruptly did give, offer, and promise anything of value to a public official with the intent to influence such public official in the performance of an official act; that is, KIM and MESSENGER gave, offered, and promised employment with and future compensation from Company A to influence BURKE, an Admiral in the United States Navy and the Commander of U.S. Naval Forces Europe and Africa, in the performance of an official act; that is, BURKE ordering a United States Government contract for Company A.

**(All in violation of Title 18, United States Code, Section 201(b)(1)(A))**

### COUNT THREE
### (Bribery – 18 U.S.C. § 201(b)(2))

50. Paragraphs 1 through 18, 27 through 44, and 47 are realleged and incorporated herein.

51. Beginning at least as early as September 2020, and continuing through October 2022, in the District of Columbia and elsewhere, the defendant,

### ROBERT P. BURKE,

being a public official, directly and indirectly, corruptly did demand, seek, receive, accept, and agree to receive and accept anything of value personally and for another person, in return for being influenced in the performance of an official act; that is, BURKE, an Admiral in the United States Navy and the Commander of U.S. Naval Forces Europe and Africa, sought and received from KIM and MESSENGER an offer of employment with and future compensation from Company A, in return for BURKE ordering a United States Government contract for Company A.

**(All in violation of Title 18, United States Code, Section 201(b)(2)(A))**

## COUNT FOUR
### (Acts Affecting a Personal Financial Interest – 18 U.S.C. § 208(a))

52. Paragraphs 1 through 18 and 27 through 47 are realleged and incorporated by reference herein.

53. Beginning at least as early as September 2020, and continuing through March 2022, in the District of Columbia and elsewhere, the defendant,

**ROBERT P. BURKE,**

being an officer and employee of the executive branch of the United States Government, that is, an Admiral in the United States Navy, knowingly and willfully participated personally and substantially as a United States Government officer and employee, through decision, approval, disapproval, recommendation, the rendering of advice, and otherwise in a particular matter, that is, the awarding of United States Government contracts to Company A, a company with which BURKE was negotiating and had an arrangement concerning prospective employment and had a financial interest.

**(All in violation of Title 18, United States Code, Section 208(a))**

## COUNT FIVE
### (Concealment of Material Facts – 18 U.S.C. § 1001(a)(1))

54. Paragraphs 1 through 18, 22 through 26, and 36 through 47 are realleged and incorporated herein.

55. Beginning at least as early as September 2020, and continuing through July 2022, in the District of Columbia and elsewhere, the defendant,

**ROBERT P. BURKE,**

knowingly and willfully falsified, concealed, and covered up by a trick, scheme, and device a material fact in a matter within the jurisdiction of the executive branch of the United States Government; that is, BURKE intended to and did conceal from the Navy the fact that he received

an offer of employment at Company A prior to taking acts to promote Company A's business within the Navy.

(All in violation of Title 18, United States Code, Section 1001(a)(1))

## CRIMINAL FORFEITURE ALLEGATIONS

56. Upon conviction of any of the offenses alleged in Count One through Count Three of this Indictment, the defendants,

**ROBERT P. BURKE,
YONGCHUL "CHARLIE" KIM, and
MEGHAN MESSENGER**

shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses, pursuant to 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c). The United States will also seek a forfeiture money judgment against the defendants equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses.

If any of the above-described property, as a result of any act or omission of defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty,

the defendants shall forfeit to the United States any other property of the defendants, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p))**

A TRUE BILL:

FOREPERSON

_____
MATTHEW M. GRAVES
UNITED STATES ATTORNEY IN AND FOR
THE DISTRICT OF COLUMBIA

_____
COREY R. AMUNDSON
CHIEF, PUBLIC INTEGRITY SECTION
UNITED STATES DEPARTMENT OF JUSTICE